UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RUDOLPH HILDEBRANDT,

                    Plaintiff,

        v.                                              **DECISION AND ORDER**
                                                              **06-CV-0166**
JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## Introduction

1.      Plaintiff Rudolph Hildebrandt challenges an Administrative Law

Judge's ("ALJ") determination that he is not entitled to a period of disability

insurance benefits ("DIB") or eligibility for supplemental security income

benefits ("SSI") under the Social Security Act ("the Act").  Plaintiff alleges he

has been disabled since December 15, 1989, because of an injury to his right

arm.

## Procedural History

2.      Plaintiff filed an application for DIB on April 28, 1993, alleging he

was disabled because of an injury to the biceps of his right arm.  This

application was initially denied, and there is no record of a request for

reconsideration.  Plaintiff filed applications for DIB and SSI on February 24,

1998, again alleging disability since December 15, 1989, because of an injury

to his right arm. His application was denied initially and upon reconsideration.

Pursuant to Plaintiff's request, an administrative hearing was held on October

14, 1999, before ALJ Carl E. Stephan, at which time Plaintiff and his attorney

appeared.  The ALJ considered the case *de novo*, and on February 15, 2000, issued a decision finding that the Plaintiff was not disabled.  Plaintiff requested review of the ALJ's decision by the Appeals Council, and by Order dated October 25, 2002, the Appeals Council vacated the hearing decision. The case was remanded for further administrative proceedings regarding whether or not Plaintiff was disabled within the time frame from his alleged onset of disability on December 15, 1989, through the date he was ultimately granted SSI benefits in April 2002, retroactive to March 2000, after he had made subsequent application following his denial of benefits on February 15, 2000.  On February 24, 2004, Plaintiff and his attorney again appeared at a hearing before ALJ Stephan.  A vocational expert also testified.  The ALJ considered the case again, and on April 14, 2004, issued a decision finding that Plaintiff was not disabled at any time during the relevant time frame from December 15, 1989, through March 2000.  Plaintiff timely requested review of the ALJ's decision by the Appeals Council, and on December 19, 2005, the Appeals Council denied Plaintiff's request for review.

3.     On February 6, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB and SSI benefits to Plaintiff.[1]  The Defendant filed an answer to Plaintiff's complaint on June 14, 2006, requesting that the Court dismiss Plaintiff's complaint.  Plaintiff submitted a

---

[1] The ALJ's April 14, 2004, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

Plaintiff's Brief requesting the Court set aside the Commissioner's decision and award benefits to Plaintiff on September 28, 2006.  On November 8, 2006, Defendant filed a Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, this Court deemed oral argument unnecessary and took the motions under advisement.

## DISCUSSION

**Legal Standards and Scope of Review:**

4.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383 (c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

---

[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under Northern District General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

5.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.      The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

7.      This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful activity.  If he is not, the [Commissioner]

next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activeties.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also

Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.     While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See

Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).

The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.     In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff met the nondisability requirements for a period of disability and

5

Disability Insurance Benefits set forth in Section 216(1) of the Social Security Act and is insured for benefits through the date of this decision (R. at 24)[3]; (2) Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability (R. at 24); (3) Plaintiff's ruptured biceps tendon of the right dominant upper extremity is a "severe" impairment, based upon the requirements of the Regulations (20 C.F.R §§ 404.1520 and 416.920) (R. at 24); (4) This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (R. at 24); (5) The ALJ found the Plaintiff's allegations regarding his limitations not totally credible for the reasons set forth in the body of the decision (R. at 24); (6) Plaintiff has the residual functional capacity to perform simple, medium work that does not require the ability to read, has no limitations with standing, sitting, walking, and requires only occasional repetitive use of the right upper extremity, and no overhead lifting with the right upper extremity (R. at 25); (7) Plaintiff is unable to perform any of his past relevant work (20 C.F.R §§ 404.1565 and 416.965) (R. at 25); (8) Plaintiff is an "individual of advanced age" (20 C.F.R. §§ 404.1563 and 416.963) (R. at 25);[4] (9) Plaintiff has a "marginal education" (20 C.F.R. §§ 404.1564 and 416.964) (R. at 25); (10) Plaintiff has no transferable skills from any past relevant work and transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968) (R. at 25); (11) Plaintiff has the residual functional capacity to perform a significant range of medium work (20 C.F.R.

---

[3] Citations to the underlying administrative record are designated as "R."
[4] Petitioner was 59 years old on the date of the decision, the subject of this civil action, and 55 years old when SSI benefits were granted retroactively to March 2000.

§§ 404.1567 and 416.967) (R. at 25); and (12) Although Plaintiff's exertional limitations do not allow him to perform the full range of medium work, using the Medical-Vocational Rule 203.11 as a framework for decision-making, there are a significant number of jobs in the national economy that Plaintiff could perform.  Examples of such jobs include work as a dishwasher, vehicle worker, and laundry worker (R. at 25).  Accordingly, the ALJ determined Plaintiff was not entitled to a period of disability, Disability Insurance Benefits, or supplemental security income payments under Sections 216(i), 223, 1602 and 1614(a)(3)(A), respectively, of the Social Security Act (R. at 25).

**Plaintiff's Allegations:**

10.     Plaintiff challenges the ALJ's determination that Plaintiff is not disabled and asserts the ALJ's decision is not supported by the substantial evidence of record.  Specifically Plaintiff alleges that (1) the ALJ ignored the assessment of Plaintiff's treating physician with regard to Plaintiff's limitations and his residual functional capacity to perform the requirements of medium work[5], and (2) the vocational expert who testified at Plaintiff's hearing took an unreasonable position with regard to Plaintiff's ability to perform substantial gainful activity.  Further, Plaintiff alleges the Appeals Council erred by failing to remand the case for further administrative proceedings because (3) the ALJ relied partially on the opinion of a State agency physician that Plaintiff had no handicap, disability or impairment, and (4) the ALJ ignored the opinion

---

[5]  The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds.  See SSR 83-10.

by a State agency examining psychologist that Plaintiff is dyslexic. The Court will address each of Plaintiff's allegations in sequence.

**ALJ Ignored the Assessment of Plaintiff's Treating Physician:**

11.     Plaintiff's first challenge to the ALJ's decision is that he ignored the assessment of Plaintiff's treating physician with regard to Plaintiff's residual functional capacity to perform the demands of medium work on a sustained basis.  See Plaintiff's Brief, p. 1, 4-8.  Specifically, Plaintiff claims the ALJ relied on the opinion of a non-examining, non-treating physician when making his determination that Plaintiff was not disabled during the time frame relevant to his claim, and gave no consideration to the opinion of Plaintiff's treating physician that Plaintiff had both exertional and non-exertional limitations that would preclude him from performing the demands of medium work.  The Court disagrees with Plaintiff's contention as discussed below.

On September 5, 1985, Plaintiff injured his right bicep in a construction accident (R. at 18, 56-57).  Plaintiff was examined by Dr. John Kavanaugh on September 6, 1985, who diagnosed "at least a partial and perhaps a complete tear of the distal aspect of the biceps tendon" (R. at 162).  Dr. Kavanaugh recommended surgery as the best treatment for Plaintiff to regain strength in the arm.  Id.  The doctor also offered Plaintiff a conservative, non-surgical treatment as an option that would be effective to relieve his pain, but would be less likely to help Plaintiff regain his strength.  Id.

Plaintiff was next examined by Dr. John Pastore on October 30, 1985, who diagnosed a rupture of Plaintiff's biceps tendon insertion (R. at 158-159). Dr. Pastore recommended Plaintiff continue with a program of rest and range of motion exercises, and opined Plaintiff had a moderate partial disability with respect to this right arm (R. at 159).

On April 28, 1986, Plaintiff was examined by Dr. Munir Jabbur (R. at 157). Dr. Jabbur noted Plaintiff had decided against surgical treatment of his injury. Id. Upon examination, the doctor found Plaintiff had a good range of motion and flexion in his right arm, but a "definite disruption of the biciptal tendon with retraction of the biceps head proximally." Id. While the doctor observed Plaintiff had some tenderness in the area of the rupture, he had "excellent strength in extension and flexion," and "no loss of sensation in the [right] hand." Id. Dr. Jabbur opined Plaintiff might have some disability with respect to heavy weight lifting, but noted "usually people can do a lot of work, including carpentry, with that kind of injury." Id. The doctor concluded Plaintiff had a mild to moderate disability in the use of his right arm and elbow. Id.

On September 10, 1986, the Workers' Compensation Board of the State of New York rated Plaintiff with a scheduled loss of 30% of the use of his right arm (R. at 163).

Plaintiff was next examined by a consulting orthopedic surgeon, Dr. Edwin Mohler, on July 10, 1992 (R. at 151-156). Upon examination, Dr. Mohler noted Plaintiff had "an obvious migration of the muscle bellies of the

biceps on the right side," but found Plaintiff had bilaterally good grips, no atrophy of the thenar or hypothenar eminences, deltoid, or winging of the scapula (R. at 156).  Testing revealed Plaintiff was neurologically intact, with reflexes present except for the right bicep.  Id.  Dr. Mohler opined Plaintiff had function of the right biceps, but weakness and intermittent spasms (R. at 151).  He assessed Plaintiff with a scheduled loss of use of the upper right extremity of 15%.  Id.  Dr. Mohler noted Plaintiff had the ability to work, but could not return to heavy labor.  Id.  The doctor also reported that Plaintiff's "subjective disability outweighs the objective findings and the usual course for a ruptured biceps tendon," and that Plaintiff's prognosis was "unfavorably influenced by his impression that two physicians told him that this will progressively worsen.  I do not know the basis for that statement" (R. at 155). No record of the names, or the examination findings, of the physicians who purportedly rendered such opinions is included in Plaintiff's record.

Plaintiff was again consultatively examined for the Workers' Compensation Board for the State of New York on October 31, 1992 (R. at 153).  The examining physician rated Plaintiff's scheduled loss of use of this upper right extremity at 37½%.  Id.

On April 16, 1993, Plaintiff complained to his treating physician, Dr. Richard Whipple, of pain in his right arm radiating up to his shoulder (R. at 152).  Upon examination, Dr. Whipple noted Plaintiff was tender over the subacromial region, with pain upon forward flexion of the right biceps.  Id.  Dr.

Whipple diagnosed tendonitis and bursitis, and Plaintiff was given an injection of celestone and marcaine in the subacromial space.  Id.

Dr. Whipple examined Plaintiff's right arm again on February 10, 1998, when Plaintiff complained of pain and stiffness, and told the doctor he thought he had a progressive disability (R. at 165).  Upon examination, the doctor observed Plaintiff could flex his right shoulder forward 160 degrees, and abduct the right shoulder 100 degrees.  Id.  The doctor noted Plaintiff's right bicep was "obviously ruptured and migrated proximally," and Plaintiff had 4/5 strength of his supinator and elbow flexion.  Id.  X-rays of Plaintiff's shoulder taken at the time of the examination showed no significant arthritis.  Id.  The doctor advised Plaintiff there was nothing more in the way of treatment options, and, at most, Plaintiff had a 50% loss of function in the right arm.  Id.  Dr. Whipple noted Plaintiff wanted to apply for social security disability benefits, but told Plaintiff he doubted he would qualify.  Id.

On April 28, 1998, Plaintiff was examined by Dr. James Schneider, a treating physician for right shoulder and right elbow pain (R. at 166-167).  Upon examination of Plaintiff's upper right extremity, the doctor observed Plaintiff had full passive and active flexion and external rotation (R. at 166).  Plaintiff lacked the last 10 degrees of internal rotation.  Id.  Plaintiff was able to abduct his arm to approximately 80 degrees with some discomfort.  Id.  Plaintiff had a positive impingement sign for shoulder impingement syndrome and equivocal Hawkin's sign. [6]  Id.  With regard to strength, Plaintiff's deltoid,

---

[6] *Shoulder impingement syndrome* describes pain in the subacromial space when the humerus is elevated or internally rotated.  During humeral flexion, the supraspinatus tendon and bursa become entrapped between

triceps, wrist flexors, and extensors were 5/5.  Id.  His supraspinatus and biceps strength was 4+/5.  Id.  Dr. Schneider noted Plaintiff's right biceps muscle had "migrated proximally somewhat."  Id.  Plaintiff had full range of motion in his elbow.  Id.  The doctor treated Plaintiff with an injection to his right shoulder, and recommended physical therapy and anti-inflammatory medication (R. at 167).

Plaintiff was next examined by Dr. Amelita Balagtas, a consulting, on August 12, 1998 (R. at 168-170).  The examination was largely unremarkable, with only minor findings pertaining to Plaintiff's right upper extremity (R. at 168-169).  As an example, the doctor noted Plaintiff's range of motion in his shoulders, elbows, forearms, and wrists, and fingers of both hands was normal bilaterally (R. at 168).  Biceps strength was 4/5 on the right side and 5/5 on the left (R. at 169).  While Dr. Balagtas noted tenderness on Plaintiff's right upper forearm and lower arm, she observed the torn right biceps was "not visibly bunched up."  Id.  The doctor reported Plaintiff had no sensory abnormality in either upper extremity, and he could make a fist and engage in fine manipulation bilaterally.  Id.  Plaintiff's grip strength was 4.5/5 on the right and 5/5 on the left.  Id.  Examination of Plaintiff's lumbar spine and lower extremities revealed normal results.  Id.  In her Medical Source Statement, Dr. Balagtas opined Plaintiff would have some limitations in

---

the anteroinferior corner of the acromion and CA ligament and the greater tuberosity.  See http://www.wheelessonline.com/ortho/shoulder_impingement_syndrome.  *Hawkin's Sign* provides evidence of revascularization of the talar body.  See http://wheelessonline.com/ortho/hawkins_sign.

activities that require the use of strength when lifting with the right upper extremity.  Id.

On August 30, 1998, a State agency physician, Dr. Richard Glaser, reviewed Plaintiff's medical records and completed a Residual Physical Functional Capacity Assessment (R. at 173-180).  Based on the medical evidence in Plaintiff's record, Dr. Glaser opined Plaintiff was capable of engaging in the demands of medium work.  Id.  Plaintiff's file was reviewed by another State agency physician, Dr. Donna M. White, on December 21, 1998, and Dr. White concurred with Dr. Glaser's August 1998 assessment (R. at 180).

Plaintiff was examined by Dr. Theresa Sirico, treating physician on May 21, 1999 (R. at 182).  Upon examination, the doctor observed Plaintiff's right bicep muscle had migrated proximally.  She noted that while his strength had been 4/5 in April 1998, it was 3/5 on the day of the examination in May 1999.  Id.  The doctor opined Plaintiff had some atrophy in the right distal biceps area.  Id.

On June 11, 1999, Plaintiff was examined by his family physician, Dr. Robert Chaloner (R. at 181).  The doctor opined there was little he could do for Plaintiff, and recommended Plaintiff again consult with an orthopedic surgeon.  Id.

Plaintiff was examined by consulting physician Dr. William Rogers on September 1, 1999 (R. at 186-188).  Upon examination, the doctor noted bunching of the right biceps muscle proximally (R. at 187).  However, Plaintiff

was able to flex the right elbow 130 degrees, with full extension, pronation, and supination.  Id.  Plaintiff could flex the right shoulder 120 degrees, abduct 100 degrees, externally rotate 70 degrees, and internally rotate 45 degrees. Id.  Dr. Rogers observed no atrophy in Plaintiff's forearms.  Id.  Motor testing revealed Plaintiff had 3/5 strength in the right biceps muscle, with normal triceps strength.  Id.  The doctor recommended no treatment for Plaintiff, other than use of an elbow brace and muscle relaxants as needed (R. at 188).

On April 24, 2000, Plaintiff underwent an intellectual evaluation by consulting psychologist, Dr. John Seltenreich (R. at 226-229).  Based on Plaintiff's test results, Dr. Seltenreich observed Plaintiff could read and decode written information only at the kindergarten level (R. at 227). However, the psychologist opined Plaintiff had low average intellectual abilities, and could understand and follow simple directions and instructions, and could perform simple rote tasks under supervision (R. at 228).  Dr. Seltenreich also thought Plaintiff may be able to perform complex tasks independently, if such tasks were performance based and Plaintiff did not have to process written information.  Id.

Plaintiff underwent another consultative orthopedic examination by Dr. Rogers, on September 18, 2003 (R. at 196-198).  Dr. Rogers noted the atrophied right distal biceps tendon, but found no tenderness over Plaintiff's right biceps or forearm (R. at 197).  Plaintiff's right grip and biceps strength was 4/5, and his right triceps strength was 5/5 (R. at 198).  An examination of

14

Plaintiff's spine was unremarkable (R. at 197).  Dr. Rogers completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), and assessed Plaintiff as being able to lift 20 pounds occasionally, carry between 10 and 20 pounds frequently, stand and walk for at least two hours in an eight-hour workday, and alternate between sitting and standing in a workday (R. at 199-202).  Dr. Rogers opined Plaintiff could only occasionally balance, kneel, crouch, crawl, stoop, and climb stairs during the workday (R. at 200).  The doctor also opined Plaintiff should avoid temperature extremes, humidity/wetness, and hazards from machinery and heights (R. at 202).

In November 2003, State agency physician Dr. Richard Goodman reviewed Plaintiff's medical records at the request of the ALJ (R. at 205).  The ALJ specifically requested that Dr. Goodman evaluate the records to determine if Plaintiff's impairment met a listing at any time from his alleged date of disability through March 1, 2000.  Id.  On November 17, 2003, Dr. Goodman opined Plaintiff had a ruptured distal biceps, and this injury resulted in a "cosmetic deformity", but caused "no handicap, disability, or impairment" (R. at 214).  The doctor completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), and assessed Plaintiff as capable of performing the demands of a full range of medium work during the pertinent time frame (R. at 217-219).

In the opinion of the Court, the assessment of Plaintiff's consulting physician, Dr. Rogers, is inconsistent with the record in this case.  As set forth in the regulations, an opinion that is not based on clinical findings will not be

accorded as much weight as an opinion that is well-supported.  See 20 C.F.R. § 404.1527(d)(3), 416.927(d)(3); see also Caneglosi v. Chater, No. 94 CV-2694, 1996 WL 663161, at *4 (E.D.N.Y. Nov. 5, 1996 (noting that "unsupported statements by a treating or other medical source that the claimant is disabled are not binding on the trier of fact and do not preclude a finding of non-disability").  It is equally well-settled that the less consistent an opinion is with the record as a whole, the less weight it is to be given.  See C.F.R. § 404.1527(d)(4), 416.927(d)(4).  In the Court's view, the restrictive assessment of Dr. Rogers was clearly contradictory to the findings of other physicians who examined Plaintiff over a 15 year period, including Doctors Jabbur, Mohler, Whipple, and Schneider.  As an example, when Plaintiff was examined by Dr. Jabbur about seven months after his injury, on April 28, 1986, the doctor noted that while Plaintiff had a definite disruption in the right biciptal tendon with retraction of the biceps head proximally, Plaintiff had excellent strength in both extension and flexion of the right extremity.  Id.  Dr. Jabbur opined that, other than jobs requiring heavy lifting, many types of work were open to Plaintiff, including carpentry.  Id.  The doctor noted Plaintiff's condition had reached a plateau, leaving him with a "mild to moderate permanent disability."  Id.

Six years later, Plaintiff was examined by Dr. Mohler (R. at 154-156).  Dr. Mohler's opinion about the degree of Plaintiff's disability agreed substantially with that of Dr. Jabbur (R. at 154-155, 157).  Dr. Mohler observed that Plaintiff had weakness in his right upper extremity as a result of

the rupture of his right biceps insertion, but opined that Plaintiff's disability was moderate and partial (R. at 154).  The doctor stated in his report that Plaintiff had the ability to return to work, but could not engage in heavy labor. Id.

Plaintiff's physician Dr. Whipple examined him on February 10, 1998, approximately five and one-half years after his examination with Dr. Mohler (R. at 165).  The doctor recorded that Plaintiff wanted to apply for Social Security Disability, but in the doctor's opinion Plaintiff had, at most, a 50 percent loss of use of his right extremity from strength production.  Id.  The doctor offered no treatment or scheduled follow-up visit, and advised Plaintiff he would see him back as needed.  Id.

Plaintiff was examined by Dr. Schneider approximately two months later, on April 28, 1998 (R. at 166-167).  While Plaintiff complained of pain in his right shoulder, the clinical findings from Dr. Schneider's examination were minimal (R. at 166).  The doctor advised Plaintiff that his treatment options were limited to conservative measures, such as injections, anti-inflammatory medications, and physical therapy (R. at 167).

On August 12, 1998, Plaintiff was examined by Dr. Amelita Balagtas (R. at 168-170).  The examination was unremarkable, except for tenderness over Plaintiff's right lower arm and upper forearm, and a decrease in strength in the right upper extremity (R. at 169).  The doctor opined Plaintiff would have some limitations in activities that require strength when lifting with the upper right extremity.  Id.

Plaintiff was examined by his consulting orthopedic physician, Dr. Rogers, on September 1, 1999 (R. at 186-188).  While Plaintiff complained of pain in his shoulder, the results of the examination were largely unremarkable.  Id.  Dr. Rogers noted bunching of the right biceps muscle, and tenderness over the right biceps and in the right forearm, but Plaintiff was able to flex the right elbow 130 degrees, with full extension, pronation, and supination (R. at 187).  The doctor recommended no treatment, including physical therapy, and suggested Plaintiff continue using an elbow and muscle relaxants as needed (R. at 188).

Two State agency review physicians, Doctors Glaser and White, examined Plaintiff's medical and diagnostic records from the date Plaintiff was injured in September of 1985, through August 30, 1998, and December 21, 1998, respectively.  Both physicians concluded that because of Plaintiff's injury to his right biceps muscle, he would be unable to perform the requirements of heavy work, but would be capable of meeting the demands of medium work.

Plaintiff was examined by Dr. Rogers four years later, on September 18, 2003 (R. at 196-198).  The doctor noted Plaintiff's complaint of back pain in the lumbosacral area, but physical examination revealed little to suggest Plaintiff had a back problem (R. at 197-198).  Examination of Plaintiff's upper right extremity showed no tenderness in the area of his right biceps (R. at 197).  On the date of this examination, Plaintiff had right grip and biceps strength of 4/5, and 5/5 strength in his right triceps and all other motor

groups (R. at 198).  Despite these unremarkable findings, Dr. Rogers completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) and assessed Plaintiff as capable of performing the requirements of light work with limitations on sitting, and adding environmental limitations for temperature, vibration, humidity/wetness, and hazards including machinery and noise (R. at 199-202).

Plaintiff's medical records were subsequently reviewed by Dr. Goodman in November 2003, who considered only whether Plaintiff's medical and other information supported his claim of disability prior to March 1, 2000 (R. at 213-219).  Dr. Goodman concluded Plaintiff was capable of the demands of medium work within the relevant time frame (R. at 217-219).

While Plaintiff takes exception to Dr. Goodman's opinion, it is well settled that an ALJ is entitled to rely upon the opinion of a State agency medical consultant, since such a consultant is deemed to be a qualified expert in the field of social security disability.  See 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); see also Leach ex. Rel. Murray v. Barnhart, No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims.  As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")  Such reliance is particularly appropriate where, as here, the opinion of the State agency physician is supported by the weight

of the record evidence, including the medical findings of Plaintiff's examining and treating physicians.

It is clear from the ALJ's decision that the medical opinion of Plaintiff's treating physician, Dr. Rogers, was considered along with the opinions of Plaintiff's treating physicians and consultative examiners, Doctors Jabbur, Mohler, Whipple, Schneider, and Balagtas, along with State agency review physicians, Doctors Glaser, White, and Goodman.  The ALJ recognized some divergence of opinion about the level of work activity of which Plaintiff might be capable, and considered unrefuted objective findings, as well as Plaintiff's self-reported symptoms and his functional illiteracy, as the most reasonable measure of determining Plaintiff's residual functional capacity (R. at 18-24).  While the ALJ found Plaintiff's allegations of totally debilitating pain and limitations not entirely credible, he recognized Plaintiff's illiteracy could significantly impact the jobs available to Plaintiff in the world of medium work (R. at 23-24).  Thus, the ALJ engaged the services of a vocational expert to assess the jobs that would be available to Plaintiff in the national and local economy.  Id.

Based on the foregoing, the Court finds that it was not improper for the ALJ to consider, yet afford less weight to the opinion of Plaintiff's treating physician, Dr. Rogers, but to ultimately predicate his disability determination on the objective medical results and consistent medical opinions contained in the record.  It is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record.  See Richardson v.

Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).

Under the circumstances presented in this case, it cannot be said that the

ALJ disregarded the medical evidence from Plaintiff's treating physician

concerning his level of disability and adopted the opinions of non-examining

or non-treating sources.  Further, it cannot be said that the ALJ considered

only the small portion of the record that supported his conclusion that Plaintiff

was not under a disability during the relevant time frame for his claim.

Rather, the Court finds the ALJ afforded less weight to the assessment of Dr.

Rogers, which was based largely on Plaintiff's subjective complaints.

Moreover, Dr. Rogers' opinions and conclusions favoring Plaintiff were

rendered approximately three and one-half years after the close of the

relevant time for Plaintiff's claim in this case.  Finally, the ALJ properly

afforded more weight to the physician opinions consistent with the objective

clinical findings in the record.

### The Vocational Expert Took an Unreasonable Position and the Appeals Council Erred by Failing to Remand:

12.     Plaintiff's second challenge to the ALJ's decision is that the

vocational expert who testified at Plaintiff's hearing took an unreasonable

position with regard to Plaintiff's ability to perform substantial gainful activity.

See Plaintiff's Brief, pp. 1, 5-6.  Specifically, Plaintiff asserts the vocational

expert and the ALJ "insisted on a fantasy world" during questioning of

Plaintiff, and that the vocational expert "was clearly incompetent and refused

to accept common sense and respond to cross examination.  See Plaintiff's

Brief, p. 6.  Plaintiff also claims the ALJ was "biased against him" because the

case was remanded to the ALJ after the first hearing on October 14, 1999. Id.  The Court disagrees with Plaintiff's assertions.

In his brief, Plaintiff has mischaracterized the questions posed to the vocational expert with regard to Plaintiff's ability to use his right arm.  See Plaintiff's Brief, pp. 5-6.  Plaintiff claims the ALJ limited Plaintiff's use of his right-handed arm to a support role only, a finding that is inconsistent with the Plaintiff's ability to do medium work.  See Plaintiff's Brief, p. 6.  Thus, because of this inconsistency, Plaintiff alleges that the ALJ's finding was unreasonable and the case must be returned for re-adjudication. However, his allegation is incorrect.  The ALJ based his hypothetical question to the vocational expert on an individual who could "sit, stand, and walk" without limitation, and engage in "only occasional repetitive use of the upper right extremity and hand, and no overhead lifting with the upper right extremity" (R. at 252).  The vocational expert asked for clarification about whether the hypothetical individual could use the right hand as a helping hand, and the ALJ responded in the affirmative.  Id.  Thus, contrary to Plaintiff's assertion, the ALJ did not limit Plaintiff's "use of his right hand to a support arm only" and has taken the ALJ's response to the vocational expert out of context.  See Plaintiff's Brief, p. 6.

As further evidence of Plaintiff's opinion that the vocational expert was incompetent and that the ALJ and vocational expert insisted on a "fantasy world" during the hearing, Plaintiff claims the vocational expert did not consider his testimony that he had been fired from other jobs because he

could not "keep up" with the work.  Id.  This argument is unavailing, however, as a vocational expert is called upon in SSI and DIB hearings to provide expert testimony about the potential jobs available to a plaintiff in the national and local economies, rather than to debate, or comment upon, jobs a plaintiff claims he or she cannot perform, or past jobs from which a plaintiff may have been terminated.  See 20 C.F.R. § 404.1566(e); see also SSR 83-14.

Plaintiff also claims the vocational expert refused to accept common sense and to respond to his questions during the hearing.  See Plaintiff's Brief, p. 6.  However, a review of the vocational expert's testimony reveals neither a lack of common sense nor a refusal to answer questions (R. at 248-267).  The vocational expert answered all questions posed to her by both the ALJ and Plaintiff's attorney.  While the vocational expert's answers may not have pleased Plaintiff, it is clear that she answered all questions from the ALJ and Plaintiff's attorney carefully and conscientiously.  Id.

Plaintiff further alleges the ALJ was biased against him because this matter was remanded to the ALJ after an earlier hearing.  See Plaintiff's Brief, p. 6.  Plaintiff claims:

> It should be noted that the Appeals Council remand in front of Administrative Law Judge Stephan was only his prior decision and not the later granting of Supplemental Security Income by the state agency when claimant turned 55 years old.  However, the Administrative Law Judge ruled not only on the prior period but claimed claimant was not disabled as of the decision and that his current status should be reviewed.  This clearly shows the Administrative Law Judge was biased against the claimant.
>
> See Plaintiff's Brief, pp. 6-7

Following its standard operating procedures contained in the Commissioner's Hearings, Appeals, and Litigation Law Manual (HALLEX), the Appeals Council will generally remand a case to the same ALJ who issued the original decision.  <u>See</u> http:www.ssa.gov/OP_Home/hallex/I-02/I-2-1-55.html.  It is unlikely that a remand from the Appeals Council for a rehearing would, as Plaintiff claims, cause the ALJ to exhibit personal animosity or bias against Plaintiff.  Further, Plaintiff asserts the ALJ's bias against him was evident because, not only did the ALJ determine Plaintiff was not disabled at any time during the relevant time period, but the ALJ recommended Plaintiff's disability status based on a subsequent application for SSI benefits be reviewed (R. at 25).  <u>See</u> Plaintiff's Brief, p. 7.  While the ALJ ruled only on Plaintiff's disability status during the relevant time frame from December 15, 1989, through March 26, 2000, he had the opportunity to observe Plaintiff at the hearing, and review Plaintiff's medical records and other evidence through the date of the decision on April 14, 2004.  The regulations at 20 C.F.R. § 416.989 require a periodic review to determine if a claimant is still eligible for benefits based on disability.  Periodic disability reviews may be scheduled for a number of reasons, including (1) someone in a position to know tells the Agency that a claimant is not under a continuing disability, and (2) evidence raises a question about a claimant's continuing disability.  <u>See</u> 20 C.F.R. 416.990(b)(8) and 20 C.F.R. 416.990(b)(9).  In this case, the suggestion by the ALJ that the Commissioner review Plaintiff's successful adjudication of disability based on his review of Plaintiff's medical and other evidence and his

observations of Plaintiff during the hearing is not supported by the record.
Rather, it is obvious that the ALJ made his recommendation because of a
continuing duty to report his observations of what he considered to be a
questionable continuing disability adjudication rather than because of
personal animosity toward Plaintiff or his attorney, or because of any bias
against Plaintiff.

Thus, based on the foregoing, the Court finds no evidence in either
the ALJ's decision or the transcript that the ALJ showed bias against Plaintiff,
either by exhibiting animosity toward Plaintiff or his attorney, or by directing
his questions to the vocational expert in such a way as to elicit only vocational
information unfavorable to Plaintiff.  Further, after reviewing the testimony of
the vocational expert, the Court finds she answered the questions directed
toward her in a competent, reasonable, and non-evasive manner.

**The ALJ Relied Improperly on State Agency Physician that Plaintiff
had no Handicap, Disability or Impairment:**

13.    Plaintiff's third challenge in this case is that the Appeals Council
erred by failing to remand the matter for further administrative proceedings
because the ALJ relied partially on the opinion of a State agency physician
that Plaintiff had no handicap, disability, or impairment.  See Plaintiff's Brief,
p. 1-2, 7.  The issue of the ALJ's consideration of the opinion of State Agency
physician Dr. Goodman was covered thoroughly in Section 11 above, and the
Court has found no error.  Thus, with respect to this issue, the Appeals
Council had no reason to remand the case for further administrative

proceedings, and the ALJ's decision became the final decision of the Commission of Social Security.

Plaintiff's civil action before the Court challenges only the determination of the ALJ that Plaintiff was not under a disability during the relevant time period, and not the failure of the Appeals Council to remand the case for further administrative proceedings.  See 42 U.S.C. § 405(g).

**The ALJ Ignored the State Agency Examining psychologist that Plaintiff is Dyslexic.**

14.    Plaintiff's fourth challenge in this matter is that the Appeals Council failed to remand the case for further administrative proceedings because the ALJ ignored the opinion of a State agency examining psychologist that Plaintiff is dyslexic.  See Plaintiff's Brief, pp. 2, 7.

As discussed in Section 13 above, Plaintiff's civil action must necessarily be directed at the decision of the ALJ, and not the failure of the Appeals Council to remand the matter for further administrative proceedings. Thus, the Court will consider Plaintiff's claim as though it had been properly framed with respect to the decision of the ALJ.

Plaintiff was examined by State agency psychologist, Dr. John Seltenreich, on April 24, 2000 (R. at 226-229).  Based on the results of the examination, Dr. Seltenreich opined that Plaintiff's reading/decoding ability was at the kindergarten level, and that Plaintiff "may in fact have dyslexia" (R. at 227).

During Plaintiff's hearing, the ALJ questioned Plaintiff about his education, which Plaintiff acknowledged as through "eighth grade, special" (R.

at 243).  The ALJ then described Plaintiff's education level as through eighth grade for the vocational expert, but in his hypothetical example stated that "the individual would need simple work where the ability to read is not required" (R. at 249-250).

In his decision, the ALJ noted, "The claimant also suffers from a severe impairment secondary to a learning disorder that renders him functionally illiterate," and, "Since the claimant's reading disability does limit the claimant to work that does not require reading or writing, the Administrative Law Judge finds that his learning disability is a severe impairment" (R. at 18).

Given the consideration the ALJ showed to Plaintiff's inability to read and write during his hearing, it cannot be said the ALJ ignored or disregarded the medical opinion of the State agency psychologist.  Rather, it is clear to the Court that the ALJ relied upon the psychologist's opinion with respect to Plaintiff's dyslexia, both when constructing his hypothetical for the vocational expert, and when determining that, although Plaintiff's inability to read and write was a severe impairment, it was not disabling within the meaning of the Act (R. at 18, 24-25, 250).

15.    The Court is troubled by the use of intemperate language in the correspondence and briefs by Plaintiff's counsel. The name calling and unprofessional behavior exhibited by counsel is unprofessional and highly inappropriate. The Court recognizes that representing Plaintiffs with disabilities can evoke emotion and frustration while practicing in what is, at

best, a difficult specialty.  Counsel is reminded of his obligations under the rules of professional conduct for the State Bar of New York and is advised to temper his language in the future conduct of his cases.

16.    After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians, consulting physicians, and State agency medical examiners, and afforded Plaintiff's subjective claims of pain, dyslexia, and other limitations an appropriate weight when rendering his decision that Plaintiff is not disabled. The Court finds no reversible error and further finds that substantial evidence supports the ALJ's decision.  Accordingly, the Court grants Defendant's Motion for Judgment on the Pleadings and denies Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is DENIED.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Dated:  March 7, 2008
         Syracuse, New York